**JERSEY CENTRAL POWER & LIGHT COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Allegheny Electric Cooperative, Inc., et al., Intervenors.**

**No. 82–2004.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 31, 1983.

Decided March 30, 1984.

Leonard W. Belter, Washington, D.C., with whom James B. Liberman and Daniel F. Stenger, Washington, D.C., were on the brief, for petitioner.

Joseph S. Davies, Jr., Atty., F.E.R.C., Washington, D.C., with whom Charles A. Moore, Gen. Counsel, and Barbara J. Weller, Deputy Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent.

William C. Wise and Robert Weinberg, Washington, D.C., were on the brief, for intervenors.

Before MIKVA, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

This is an appeal from orders issued by the Federal Energy Regulatory Commission concerning electric rate increases filed by Jersey Central Power and Light Company. The first order modified a rate schedule to exclude from the rate base Jersey Central's investment in a cancelled nuclear plant and, as a consequence, ordered the utility to file reduced rates. The second order denied a petition for rehearing. We affirm the Commission in both instances.

I.

On March 31, 1982, Jersey Central filed with the Commission proposed rate schedules for service to six wholesale customers. The schedules proposed a two-step rate increase. Phase A has gone into effect and is not at issue here. Phase B amounted to a 19% rate of return on common equity, which would have resulted in an overall rate of return of 12.62%, and represented an annual increase of about $2 million. In Phase B, Jersey Central proposed to amortize over a fifteen-year period a $397 million investment lost when it suspended construction of a nuclear generating station at Forked River. Jersey Central also sought a return over the amortization period to cover the carrying charges on the debt and preferred stock portions of the unamortized investment in the cancelled plant.

Jersey Central's wholesale customers petitioned the Commission, urging it to reject that part of Jersey Central's Phase B request which sought a return on the unam-

ortized portions of the loss in the cancelled nuclear plant by including the loss in the rate base. Consistent with its policy of such abandoned investments, the Commission granted the wholesalers' petition for summary disposition, relying on *New England Power Co.*, 8 F.E.R.C. (CCH) ¶ 61,054 (July 19, 1979), *aff'd sub nom. NEPCO Municipal Rate Committee v. FERC*, 668 F.2d 1327 (D.C.Cir.1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982) ("*NEPCO*"). The Commission thus allowed Jersey Central to recover the expense of building the cancelled project, but denied the company any return on the unamortized portion of that investment sufficient to cover the carrying charges on the debt and preferred stock portions of the unamortized investment. This is the only return on investment involved here. Though Jersey Central is not seeking a return of the unamortized portion of that part of its investment allocable to the common equity investors, the return it does seek would, of course, ease the burden on those investors.

On June 24, 1982, Jersey Central petitioned for rehearing, relying primarily on the "end result" standard enunciated in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). That test, the company argued, requires that "a hearing be held in order to assess the end result of the Commission's summary disposition order, in the event that Jersey Central be required to reduce its Phase B rates." Application of Jersey Central Power & Light Co. for Rehearing, Joint Appendix ("J.A.") at 105. Jersey Central claimed to be "in extremely precarious financial circumstances" and "unable to attract additional capital other than capital supplied through a very restrictive revolving credit agreement." *Id.* at 107. The company maintained it was automatically entitled to a hearing, since application of the Commission's policy would produce a rate having an unreasonable "end result." Jersey Central also argued that exclusion of its entire investment in the cancelled plant from the rate base was inconsistent with prior judicial and Commission precedent, especially those cases dealing with rate base treatment of abandoned gas pipelines.

The Commission denied rehearing with respect to that part of its order refusing to allow Jersey Central to include in its rate base the investment in the cancelled nuclear facility. It held that the "reasonableness" of an end result under the *Hope* test could not be evaluated "without regard to the individual components which comprise a rate." *Jersey Central Power & Light Co.*, 20 F.E.R.C. (CCH) ¶ 61,083, at 61,181 (July 23, 1982) (Order Granting in Part and Denying in Part Application for Rehearing) ("Commission Order"). And where, as here, the Commission has an established policy, no hearing was required "to implement this policy determination." Commission Order at 61,182. The Commission also distinguished the gas pipeline decisions, which Jersey Central tried to use to establish that the policy had been inconsistently applied, on the grounds that the gas utilities had, in those cases, employed a different method of financing. *Id.* Finally, the Commission refused to allow Jersey Central to "inflat[e] the rate of return to recover dollars equal to those attributable to its impermissible rate base inclusion," because Jersey Central's case-in-chief did not support a higher rate of return, and because FERC "has long held that utilities may not present a 'moving target' by offering alternative justifications for previously filed rates." *Id.*

In this court, Jersey Central advances several arguments for overturning the Commission's result. It will be convenient to the discussion to divide these into two groups. The first consists of arguments that directly attack the application of a rule against including in the rate base the cost of investments in abandoned projects for electricity generation. The second group is made up of arguments that, whatever the validity of that rule, the company was entitled to a hearing to alter the results here.

## II.

■ Jersey Central first attacks the decision on the ground that the Commission's

ruling is not mandated by any established policy, or, at least, no policy that ought to be followed here. This argument has two aspects. The existence of a policy is conceded, as it must be. The Commission in this case relied upon *New England Power Co.*, 8 F.E.R.C. (CCH) ¶ 61,054 (July 19, 1979), *aff'd sub nom. NEPCO Municipal Rate Committee v. FERC*, 668 F.2d 1327 (D.C.Cir.1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982). *NEPCO* demonstrates that FERC has articulated a valid policy against permitting a utility a return on the unamortized portion of that utility's investment in an abandoned electrical generating station. The Supreme Court long ago upheld the general principle underlying this policy—namely, that utilities are not entitled to have included in their rate base properties not "used and useful" in providing service to ratepayers. *Denver Union Stock Yard Co. v. United States*, 304 U.S. 470, 475, 58 S.Ct. 990, 994, 82 L.Ed. 1469 (1938) (Under the Constitution, a utility "is entitled to rates, not *per se* excessive and extortionate, sufficient to yield a reasonable rate of return upon the value of the property used, at the time it is being used, to render the services. But it is not entitled to have included any property not *used and useful* for that purpose.") (emphasis added) (citations omitted).[1]

In *NEPCO*, the New England Power Company proposed to recover over a five-year period an investment loss of approximately $13 million in a partially constructed, but later cancelled, electric generating facility. The company also proposed to

include, in an interim rate, the unamortized portion of its investment loss in its rate base. Under the New England Power Company's proposal, the investors would have been made 100% whole by receiving back their entire investment over a five-year period, including the time value of their money. The Commission, as it did here, allowed the company to recover only its expenditures on the project, and denied rate base treatment for the unamortized portion of the loss. 668 F.2d at 1332–33. We upheld the Commission's ruling on the ground that, *inter alia:*

> The general rule recognized by this court is that expenditure for an item may be included in a public utility's rate base only when the item is "used and useful" in providing service; that is, current rate payers should bear only legitimate costs of providing service to them.

668 F.2d at 1333.

The Commission has since applied this policy to other utility losses resulting from cancellation or abandonment. For example, in *Northern States Power Co.*, 17 F.E.R.C. (CCH) ¶ 61,196, at 61,380–81 (Dec. 3, 1981), FERC denied the utility the same rate base treatment requested here. Also, in that case, as Jersey Central concedes, "FERC made clear that its intention was that the investors receive back their entire investment but be denied all return on that investment during the amortization period." Initial Brief of Jersey Central at 19. Other cases also establish that this has been the Commission's policy.[2]

---

1. *See United Gas Public Service Co. v. Texas*, 303 U.S. 123, 144, 58 S.Ct. 483, 493, 82 L.Ed. 702 (1938); *Tennessee Gas Pipeline Co. v. FERC*, 606 F.2d 1094, 1109 (D.C.Cir.1979), *cert. denied*, 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1113 (1980); 1 A.J.G. Priest, *Principles of Public Utility Regulation* 174–77 (1969). *See also FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942); *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 56–57, 56 S.Ct. 720, 727–728, 80 L.Ed. 1033 (1936). As the Court explained in *FPC v. Natural Gas Pipeline Co.*:

> [R]egulation does not insure that the business shall produce net revenues, nor does the Constitution require that the losses of the business in one year shall be restored from future

earnings by the device of capitalizing the losses and adding them to the rate base on which a fair return and depreciation allowance is to be earned. The deficiency may not be thus added to the rate base, for the obvious reason that the hazard that the property will not earn a profit remains on the company in the case of a regulated, as well as an unregulated, business.

315 U.S. at 590, 62 S.Ct. at 745 (citations omitted).

2. The Commission subsequently has applied the *NEPCO* precedent at the tariff filing stage of its proceedings to deny summarily a return on investment for this on at least three other occasions. *See Black Hills Power & Light Co.*, 19

Jersey Central attempts to avoid the impact of that showing by contending that the Commission does not apply the policy consistently and that, in any event, it is irrational to apply the policy to the facts here. We are not persuaded by either argument.

The claim of policy inconstancy is based upon certain gas pipeline decisions—*Ozark Gas Transmission System*, 16 F.E.R.C. (CCH) ¶ 61,099 (July 28, 1981) and *Trailblazer Pipeline Co.*, 18 F.E.R.C. (CCH) ¶ 61,244 (Mar. 12, 1982)—which, the company argues, provide support for its claim that the Commission has no firmly established rule denying rate base inclusion in cases like this. The two cases are inapposite. In *Ozark* and *Trailblazer*, the Commission allowed the utilities to recover "debt service (the debt-related portion of depreciation and all interest costs), actual operating and maintenance expenses, and actual taxes other than income ... without regard to the actual use of the pipeline." *Trailblazer*, 18 F.E.R.C. (CCH) at 61,500. These projects, however, were financed not by "conventional financing," as was Jersey Central's abandoned Forked River plant, but by "project financing." Project financing is, according to the Commission, "an alternative financing method in which the stream of income generated by the project is the primary security for the loan. This financing method is available only if the stream of revenues from the project is assured irrespective of the degree of the project's success." *Id.* FERC allows project financing only on the condition that the applicants waive "their right to apply for the recovery of their equity investment in th[e] project should it fail." *Id.* at 61,503. Here, it will be recalled, Jersey Central will, over a fifteen-year amortization period, recover the equity portion of its investment, although it is being denied any return.

Jersey Central correctly points out that the Commission has acknowledged that the ratemaking treatment accorded cancelled electric generating projects has, at times, been inconsistent with the treatment accorded gas pipeline projects. *Trailblazer*, 18 F.E.R.C. (CCH) at 61,511 n. 15. In *Trailblazer*, the Commission declined to resolve this inconsistency because "the question [was] not squarely before [it] on the facts of the case." *Id.* Jersey Central also quotes the Commission's observation that "policy considerations have led [it] in the direction of a consistent and more liberal allowance of abandoned plant costs in cost of service." *Id.* at 61,502. Jersey Central has been the beneficiary of this more liberal allowance. The company has not been denied *any* recovery of the loss resulting from the cancelled project, despite the non-"used and useful" nature of the project. To the contrary, Jersey Central is being permitted to recoup moneys expended on the Forked River project. There is a difference between the Commission's approach here and its approach in some of the gas pipeline cases. But the treatment accorded the pipelines, if applied here, would not permit Jersey Central to recover its equity investment, the debt, the carrying charges on the debt, and the preferred stock costs, all of which it attempted to do by including the Forked River investment in its rate base. The question of whether Jersey Central should have been afforded the option of project financing, thus securing debt but risking equity, is not before us because that is not what the company sought before the Commission.

Jersey Central next contends that it is irrational for the Commission to apply its general policy to this case because of the difference in the proposed amortization periods. The five-year amortization period in *NEPCO* was much more favorable to the investors than the fifteen-year period chosen here. That is certainly true. The longer investors must wait to recover their investment, with no return on that investment, the greater the hardship is to them. Jersey Central contends that its investors

should fare at least as well as NEPCO's. There is no such requirement in the law. The Commission's abandonment rule balances the interests of ratepayers and investors. As we said in upholding that rule:

> Because it would be inequitable to place on the utility the entire loss of expenditures prudent when made, FERC allowed recovery thereof over time. At the same time, FERC is charged with a duty to protect the consumer against unreasonably high rates.... FERC here struck a reasonable balance between the interests of investors and ratepayers. This court has recognized the value and propriety of such a practical approach ....

*NEPCO,* 668 F.2d at 1333.

Application of the abandonment rule to a situation with a different period of amortization alters the balance between ratepayers and investors but we cannot say that the balance has moved here so far from that achieved in *NEPCO* to have taken the balance out of the range that is reasonable. If the abandonment rule had to be modified or dropped every time some other feature of a tariff made the balance between investors and ratepayers different from that in *NEPCO,* there would be nothing left to call a rule. It is also to be borne in mind that Jersey Central, knowing, at the very least, that the Commission asserted that it had a policy of not including the cost of aban-

doned projects in the rate base, nevertheless filed rate increases that attempted to put the cost of Forked River in the rate base, and Jersey Central, rather than the Commission, chose the fifteen-year amortization period. *See FPC v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 153, 83 S.Ct. 211, 215, 9 L.Ed.2d 199 (1962).

## III.

Jersey Central's arguments that it was entitled to a hearing are no more persuasive than its challenges to the abandonment rule. The analysis set out above shows that there was no need to give Jersey Central a hearing on its claims that the rule did not exist or, if it did, could not be applied here. Such an attack raises no "issue of adjudicative fact," and the Commission was under no obligation to grant Jersey Central a hearing. *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1956); 3 K. Davis, *Administrative Law Treatise* § 14.5, at 26–27 (1980).[3]

Nor was a hearing required because Jersey Central offered to make an alternative evidentiary presentation in support of the rates it sought. In order to justify the increased rates once the Commission had rejected the proposed treatment of the

---

**3.** When a utility's entire filing consists of a legal challenge to well-entrenched policy, there is no need for the Commission to grant the challenger a hearing.

> There are occasions when an agency may dispose of a controversy on the pleadings without an evidentiary hearing when the opposing presentations reveal that no dispute of fact is involved, but only a question of law or administrative policy of such a nature that there is neither a dispute as to material facts nor a need to ventilate the underlying facts to aid in policy determination. *Citizens for Allegan County, Inc. v. FPC,* 134 U.S.App.D.C. 229, 414 F.2d 1125 (1969). These matters present to the agency a procedure that may readily be likened to the motion for summary judgment contemplated by Rule 56 of the Federal Rules of Civil Procedure.

*Municipal Light Boards v. FPC,* 450 F.2d 1341, 1345–46 (D.C.Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). *See*

also *Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 242 (D.C.Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980).

Even if we treated Jersey Central's petition for rehearing as a waiver request, it is settled that such a request does not automatically entitle the supplicant to a hearing. If permission to seek a waiver necessarily meant that a hearing was required "a rule would no longer be a rule." *United States v. Storer Broadcasting Co.,* 351 U.S. at 201, 76 S.Ct. at 769. As the Supreme Court has said:

> As the Commission has promulgated its Rules after extensive administrative hearings, it is necessary for the accompanying papers to set forth reasons, sufficient if true, to justify a change or waiver of the Rules. We do not think Congress intended the Commission to waste time on applications that do not state a valid basis for a hearing.

*Id.* 351 U.S. at 205, 76 S.Ct. at 771.

Forked River investment, Jersey Central would have had to change certain cost service elements. The Commission has "long held that utilities may not present a 'moving target' by offering alternative justifications for previously filed rates." Commission Order at 61,181, *citing Western Power Division, Central Telephone & Utilities Corp.*, Docket No. ER76–92 (Aug. 17, 1976); *Northern States Power Co.*, 54 F.P.C. 1572, 1573–75 (1975); *Minnesota Power & Light Co.*, Docket No. E–9499 (Oct. 9, 1975); *New England Power Co.*, 54 F.P.C. 468, 469 (1975), *aff'd, New England Power Co. v. FPC*, No. 75–1379 (1st Cir. Nov. 13, 1975); *Georgia Power Co.*, 54 F.P.C. 458 (1975); *Central Vermont Public Service Corp.*, Docket No. E–9040 (Aug. 5, 1975), *reh'g denied*, 54 F.P.C. 1441 (1975). *See also FPC v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962). The rule barring "moving targets" is not arbitrary. It is justified by the "administrative necessity of closing the books at a time certain," as well as the need for a "mechanism to prevent utilities from delaying refund orders by offering alternative justifications for the rate increases [they have] filed. FPC staff and intervenors cannot be expected to follow a moving target." *New England Power Co. v. FPC*, No. 75–1379, slip op. at 3 (1st Cir. Nov. 13, 1975), *cited* in Commission Order at 61,182.

■ Jersey Central's final contention is that a hearing was required so that it could prove that the refusal to include the unamortized portion of the Forked River investment in the rate base results in a violation of the "end result" test enunciated in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). We think the company places more weight on *Hope* than it will bear.[4] The Supreme Court there recognized the investor's "legitimate

concern with the financial integrity of the company whose rates are being regulated." *Id.* at 603, 64 S.Ct. at 288.

> From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.

*Id.* (citations omitted). Judicial inquiry is warranted where the "total effect of the rate order is ... unjust and unreasonable." *Id.* at 602, 64 S.Ct. at 288.

The *Hope* court also said:

> [T]he Commission [is] not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of "pragmatic adjustments." And when the Commission's order is challenged in the courts, the question is whether that order "viewed in its entirety" meets the requirements of the Act. Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling.

320 U.S. at 602, 64 S.Ct. at 287, *quoting FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942) (citations omitted).

In isolation these passages may seem to support Jersey Central's demand for a full evidentiary hearing. But the *Hope* opinion contains another theme: " 'regulation does not insure that the business shall produce

---

**4.** Jersey Central acknowledges, as it must, that FERC generally has discretion to summarily order a utility to exclude certain expenses from its rate base. Initial Brief of Jersey Central at 32 ("[I]n normal circumstances, FERC can de-

cide individual issues in piecemeal fashion and order reduced rates reflecting the dollar impact of each individual issue."). *See* 18 C.F.R. § 385.217(b) (1983).

net revenues.'" *Hope,* 320 U.S. at 603, 64 S.Ct. at 288, *quoting FPC v. Natural Gas Pipeline Co.,* 315 U.S. at 590, 62 S.Ct. at 745. *See FPC v. Tennessee Gas Transmission Co.,* 371 U.S. at 152, 83 S.Ct. at 215 ("[T]he hazard of not making a profit remains on the company ....").

Relying upon a very broad reading of *Hope*'s first theme, Jersey Central argues that, as a result of the Commission's orders, its rate of return overall will be too low to be characterized as "just and reasonable." In denying rehearing, however, the Commission responded that "the reasonableness of that end result cannot be evaluated without regard to the individual components which comprise a rate." Commission Order at 61,181. This is a rather terse explanation and we wish that in the future the Commission would share its undoubted expertise with us a bit more generously. We understand the Commission to be saying, however, that the end result is to be judged by the rate of return allowed on items for which a rate of return is allowable, the Forked River expenditure is not such an item, and the rates are just and reasonable as to those cost items that are properly in the rate base. The dispute thus boils down to the question of whether the end result test is to be applied to a utility overall or only to those assets which valid Commission rules permit to be included in the rate base.

The first theme of *Hope* tends to support Jersey Central's concept that the measure is the company's overall rate of return, for that is the relevant rate of return for purposes of maintaining credit and attracting capital. But that is apparently contradicted by the observation that regulation need not insure net revenues. Whether or not these themes are reconcilable, we think the Commission's view of the end result test is a permissible one and we think so for reasons beyond the deference we owe the Commission's views.

The requirement that property included in a rate base must be "used and useful"

antedates *Hope*'s end result test and is not generally regarded as overridden by that test. Such a broad view of *Hope* would revolutionize ratemaking. If the end result test were regarded as always applicable to a utility's overall rate of return, the entire complicated apparatus of ratemaking would be superfluous. The Commission would need only adjust rates until it found the lowest rates that permitted the utility to maintain credit and attract capital. Concepts such as that of a rate base would be unnecessary. The fact that this is not the way the ratemaking process works is a strong indication that Jersey Central's view of the end result test is too broad.

Because the rates set by FERC are primarily challenged by utilities on the grounds that they are "unjust and unreasonable," 16 U.S.C. § 824d(a) (1982), and therefore do not generate a fair return, forcing the Commission to hold a hearing each time a utility claimed that applying a particular policy would produce an unjust and unreasonable end result would effectively end the "judicially-recognized exception to [a utility's] statutory right to a Commission hearing ... where the facts are not in dispute and the new tariff contravenes valid and explicit FPC [now FERC] regulations or policy." *United Gas Pipe Line Co. v. FPC,* 551 F.2d 460, 463 (D.C.Cir.1977), *citing FPC v. Texaco, Inc.,* 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1956), and *Municipal Light Boards v. FPC,* 450 F.2d 1341 (D.C. Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972).

This is not a case in which the utility alleges that unjust and unreasonable rates are driving it into bankruptcy. Nor is it a case in which the utility claims that its ability to provide service to its customers is threatened. Jersey Central's expressed concern is for the well-being of its common equity investors who are paying the carrying charges on the debt and preferred

stock. That one may sympathize with their plight does not mean that the Commission acted beyond its authority. No hearing was required because the Commission was entitled to apply its established rule excluding the cost of abandoned projects from the rate base and to read the end result test as applying only to rates computed from items properly included in the rate base. The Forked River investment could be excluded from the rate base and there was no dispute about other items that would require a hearing.

Nothing we have said, of course, is intended to prejudice any new rate tariff filing or request for a waiver by Jersey Central. We hold only that the Commission here acted within its authority and, for that reason, its decision is

*Affirmed.*

