PIERCE, Justice,
specially concurring:
¶ 29. I concur with the majority decision, but I write separately to provide additional analysis regarding the interplay between public utility regulation and the subject Base Load Act. In authorizing the Commission to include in an electric utility’s rate base and rates all cost expenditures determined by the Commission to be prudently incurred in connection with a generating facility, the Base Load Act sanctions the prudent investment theory that arose out of a series of United States Supreme Court decisions-culminating with the Court’s landmark decision in Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). By allowing recovery of such costs, regardless of whether the generating facility is ever placed into service, the Base Load Act advances this particular regulatory theory to the nth degree. This undoubtedly takes us into new and unchartered territor — which warrants discussion.
¶ 30. Like any business, a utility company is a “profit making enterprise, run by [businesspeople, who] no doubt ... seek to charge the rate [they think] the traffic will bear.” Miss. Power Co. v. Goudy, 459 So.2d 257, 271 (Miss.1984) (Hawkins, J., specially concurring). But, unlike most other businesses, it is precluded from doing so. Based on principles of English common law, government has the right to regulate businesses charged with a public interest, for reasons discussed by the United States Supreme Court in Munn v. Illinois, 94 U.S. 113, 134, 24 L.Ed. 77 (1876), the case which marked the beginning of the constitutional price-regulation doctrine in this country, with its holding that Illinois had the power to fix the prices charged by grain-elevator operators.[20] On *918 the other hand, because it is allowed monopoly status, the utility company, in large measure, is immune from the natural forces of competition that regulate prices in the open market. In trade for this privilege, the utility is allowed to ’charge only rates that are just and reasonable to the ratepayers and which will yield a fair rate of return to the utility for its services. State ex. rel. Allain v. Miss. Pub. Serv. Comm’n, 435 So.2d 608, 612 (Miss.1983).
¶31. Under Mississippi law, the consumer has the “unquestionable right” that the rates charged by a monopoly will be fair and reasonable.' Miss.Code Ann. § 77-3-33 (Rev.2009); Goudy, 459 So.2d at 273 (Hawkins, J., specially concurring). And the utility has the “unquestionable right” to receive a fair and reasonable return for the services it renders. Id. The inherent complexities faced by the Commission in trying to balance these rights cannot be exaggerated, as this Court articulated in Allain, 435 So.2d at 612:
The duties of the Commission are awesome and their responsibilities great in a most difficult, ongoing situation. Mississippi Code Annotated, § [77-3-33], authorizes the Commission to establish rates that are just and reasonable to the ratepayers and which will yield a fair rate of return to the utility for its services. In effect the Commission is the counterpart of the market place by which other businesses are measured. This is so because public utilities are monopolies engaged in the business of furnishing necessary services to the public. Obviously, the legislative intent in creating the [Commission] was to interpose an authoritative body between the rate payers of the utility and the investors in the utility so that their respective interests, necessarily antagonistic, might be equitably served.
¶ 32. Since the passage of the Public Utilities Act of 1956 (“1956 Act”), the Commission has rejected construction-work-in-progress (CWIP) costs from rate bases in almost every instance where the item was proposed,[21] for these reasons: (1) CWIP costs were not “used and useful in the rendition of [utility] service to rate payers[;]” and “it was not the general practice of this jurisdiction to include CWIP in the rate base.” Miss. Pub. Serv. Comm’n v. Miss. Power Co., 429 So.2d 883, 897 (Miss.1983). (2) The utility company suffered no injustice from having CWIP costs excluded from the rate base, because, after construction work is completed and the plant is put into service, its entire cost, including interest, taxes, and overhead, is capitalized, and these costs could then be added to the utility’s rate base. United Gas Corp. v. Miss. Pub. Serv. Comm’n, 240 Miss. 405, 127 So.2d 404 (1961). (3) Requiring ratepayers to pay a utility a return *919 on CWIP costs is inequitable, because this would force current ratepayers to pay a return on property constructed for future ratepayers-with the result that, when the future ratepayers begin to receive the new, upgraded service, the utility would derive a double return on the cost of construction. Southern Bell Tel. & Tel. Co. v. Miss. Public Serv. Comm’n, 237 Miss. 157, 113 So.2d 622 (1959).
¶ 33. We affirmed the Commission’s decision to exclude CWIP costs from the rate base in each mentioned case under our limited standard of review, without any real discussion why. The “used and useful” language relied upon by the Commission for excluding CWIP is an important concept in utility regulation and requires discussion.
¶ 34. The language was included in the 1956 Act through the predecessor to Section 77-3-33, Section 7716-08 of the Mississippi Code 1942 (1956), which reads:
No rate made, deposit or service charge demanded or received by any public utility shall exceed that which is just and reasonable. Such public utility, the rates of which are subject to regulation under the provisions of this article, may demand, collect and receive fair, just and reasonable rates for the services rendered or to be rendered by it to any person. Rates prescribed by the commission shall be such as to yield a fair rate of return to the utility furnishing service, upon reasonable value of the property of the utility used or useful in furnishing service.
It was added to Mississippi Code Section 77-3-43 in 1983, when that Section was amended, as shown by the following (highlighted) language:
In regulating the rates of any public utility subject to the provisions of this chapter, the commission shall, on hearing after reasonable notice, ascertain and fix the rate base of the property of the public utility in such manner as to be fair both to the public utility and to the consumer when the same is relevant or material to the exercise of the jurisdiction of the commission. The commission shall make readjustments from time to time, and ascertain the cost of all new construction, extensions and additions to the property of every public utility. In arriving at such rate base, the commission shall give due consideration to: (a) the reasonable original costs of the property used and useful, or to be used and useful within a reasonable time after the test period; (b) the portion of the cost which has been consumed by previous use recovered by depreciation expense; (c) the allowance for funds used during construction [AFUDC], not to exceed on borrowed funds the true net interest cost of such funds, computed according to the actuarial method, and, on the equity component thereof, a rate of return granted on common equity in the last rate proceedings before the commission, or if such rate has not been established within the preceding three (3) years, then the average rate of return actually earned on equity during the preceding three (3) years; (d) any other elements deemed by the commission to be material in determining the rate base for rate-making purposes.
The “used and useful” language is carried over into the new Base Load Act through Mississippi Code Section 77 — 3—105(l)(a), which reads:
The commission is fully empowered and authorized to include in an electric public utility’s rate base and rates, as used and useful components of furnishing electric service, all expenditures determined to be prudently-incurred pre-con-struction, construction, operating and related costs that the utility incurs in *920 connection with a generating facility (including but not limited to all such costs contained in the utility’s “Construction Work in Progress” or “CWIP” accounts), whether or not the construction of any generating facility is ever commenced or completed, or the generating facility is placed into commercial operation.
¶ 35. Most authorities regard the “used and useful” language, conceptually, as having derived from the United States Supreme Court’s decision in Smyth v. Ames, 169 U.S. 466, 546, 18 S.Ct. 418, 42 L.Ed. 819 (1898), in which the Court held that:
[T]he basis of all calculations as to the reasonableness of rates to be charged by a [public utility] must be the fair value of the property being used by it for the convenience of the public .... What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it ... than the services rendered by it are reasonably worth.
Id. at 546-47, 18 S.Ct. 418 (emphasis added). The concept, however, was also expressed in Munn, where the Supreme Court spoke to an English case, Aldnutt v. Inglis, 12 East, 527, decided in 1810, in which the question was presented whether the London Dock Company could charge arbitrary rates for storing imported wines, after having obtained authority under the general warehousing act to engage in such services. Munn, 94 U.S. at 127. Munn noted:
¶ 36. Upon this point, Lord Ellenbor-ough said:
There is no doubt that the general principle is favored, both in law and justice, that every man may fix what price he pleases upon his own property, or the use of it; but if for a particular purpose the public have a right to resort to his premises and make use of them, and he have a monopoly in them for that purpose, if he will take the benefit of that monopoly, he must, as an equivalent, perform the duty attached to it on reasonable terms. The question then is, whether, circumstanced as this company is, by the combination of the warehousing act with the act by which they were originally constituted, and with the actually existing state of things in the port of London, whereby they alone have the warehousing of these wines, they be not, according to the doctrine of Lord Hale, obliged to limit themselves to a reasonable compensation for such warehousing. And, according to him, whenever the accident of time casts upon a party the benefit of having a legal monopoly of landing goods in a public port, as where he is the owner of the only wharf authorized to receive goods which happens to be built in a port newly erected, he is confined to take reasonable compensation only for the use of the wharf.
Aldnutt v. Inglis, 12 East, 527, 537 (1810) (emphasis added).
¶ 37. After Smyth, it was believed that the United States Constitution required rates to be set according to the actual present value of the assets employed in public service-a precedent known as the “fair value” rule. Duquesne Light Co. v. Barasch, 488 U.S. 299, 308, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). Smyth analogized ratemaking with eminent-domain principles. Smyth, 169 U.S. at 544, 18 S.Ct. 418. And the “fair value” rule necessitated that property be “used and useful” before it could be included in the rate base. Glustrom v. Colorado Pub. Utils. Comm’n, 280 P.3d 662, 669 (Colo.2012) (citing Denver Union Stock Yard Co. v. U.S., 304 U.S. 470, 475, 58 S.Ct. 990, 82 L.Ed. 1469 (1938)). As the United States Court of *921 Appeals for the District of Columbia explained:
Under [Smyth], courts had [to] meticulously scrutinize! ] rate orders to ensure that investors received the “fair value” of the property dedicated to public use. The “fair value” standard required courts to estimate the current market value of the property, and rates that provided anything less were deemed confiscatory. The governing theory required that consumers pay the market value of the property they were using because the property was regarded as having been taken. Recovery was therefore required only on property “used and useful” to the public, for property that was not being used could not be considered to have been taken.
Jersey Central Power & Light Co. v. FERC, 810 F.2d 1168, 1176 (D.C.Cir.1987) (emphasis added).
¶ 38. Smyth’s “fair value” rule functioned adequately until World War I, when tremendous inflation skewed the valuation of utility property upward to the point that ratemaking valuation of utility property greatly exceeded the actual amount of investment capital in the utility. Diamond State Tel. Co., 9 Terry 317, 103 A.2d 304 (Del.Super.1954). “The Smyth rule resulted in such high constitutional limits on rates that most utilities were satisfied with rates below the constitutional minimum.” John N. Drobak, From Turnpike to Nuclear Power: The Constitutional Limits on Utility Rate Regulation, 65 B.U.L.Rev. 65 (1985). “The Smyth rule came to mean that utility companies could charge what the market would bear, and government was constitutionally unable to moderate their charges in order to protect the public from excessive charges.” Id.
¶ 39. Economists and legal commentators soon became critical of Smyth because the “fair value” rule produced arbitrary and fluctuating results. And in his classic concurrence in Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923), Justice Brandéis began the Supreme Court’s attempt to correct the ratemaking problems caused by Smyth. Southern Bell, 113 So.2d at 645-46. Justice Brandéis urged the Court to replace the “fair value” rule with a principle that gave the utility the opportunity to earn a fair return on the amount prudently invested in it. Missouri, 262 U.S. at 306-07, 43 S.Ct. 544.
¶ 40. In 1942, the Supreme Court overruled much of Smyth with its holding in Federal Power Comm’n v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942) (construing the Natural Gas Act of 1938), that “[t]he Constitution does not bind rate-making bodies to employ any single formula or combination of formulas” in regulating rates. Two years later, in the landmark decision Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944), the Supreme Court decisively abandoned the “fair value” rule by reasoning that: “Rates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so called ‘fair value’ rate base.” Hope, 320 U.S. at 605, 64 S.Ct. 281. Hope explained that:
From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock.... By that standard the return to the equity owner should be commensurate with *922 returns on investments in other enterprises having corresponding risks.
Id. at 603, 64 S.Ct. 281. The Court instructed that: “The rate-making process ..., i.e., the fixing of ‘just and reasonable’ rates, involves a balancing of the investor arid the consumer interests.” Hope, 320 U.S. at 603, 64 S.Ct. 281.
¶ 41. As recognized by this Court in Southern Bell, the leading case in Mississippi on utility ratemaking, Hope “radically altered the course of utility regulation” throughout the country with its holding that, under the statutory standard of just and reasonable, it is not the method employed that is controlling, but the end result reached. Southern Bell, 113 So.2d at 647. Southern Bell explained that:
The effect of the decision in the Hope case was to free the state commissions as far as the Federal Constitution was concerned from any restriction in their choice of a rate base. Many state courts and commissions turned from fair value to original cost, although elsewhere fair value continued as the accepted rate base, not because of Federal constitutional requirements but because of state law.
Southern Bell, 113 So.2d at 647.
¶ 42. The used-and-useful principle was relegated to one of multiple theories or tests by Hope ⅛ end-result standard. And the principle no doubt has been blurred by the accession of modern ratemaking. As one commentator points out, the U.S. Court of Appeals for the D.C. Circuit “struggled mightily” with the application of the used-and-useful principle in three successive Jersey Central Power & Light Co. v. FERC decisions dealing with a canceled nuclear power plant — all majority opinions authored by Judge Robert H. Bork.[22] See James J. Hoecker, “Used and Useful”: Autopsy of a Rate Making Policy, 8 Energy Law Journal 303 (1987). In Jersey Central (III), Judge Bork said:
In addition to prohibiting rates so low as to be confiscatory, the holding of [Hope ] makes clear that exploitative rates are illegal as well. If the inclusion of property not currently used and useful in the rate base automatically constituted exploitation of consumers, as one of the amici maintains, then the Commission would be justified in excluding such property summarily even in cases where the utility pleads acute financial distress. A regulated utility has no constitutional right to a profit, see FPC v. Natural Gas Pipeline Co., 315 U.S. at 590, 62 S.Ct. at 745, and a company that is unable to survive without charging exploitative rates has no entitlement to such rates. Market Street Ry. v. Railroad Comm’n of Cal., 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945). But we have already held that including prudent investments in the rate base is not in and of itself exploitative, Washington Gas Light Co. v. Baker, [188 F.2d 11 (D.C.Cir.1950) ] and no party has denied that the Forked River investment was prudent. Indeed, *923 when the regulated company is permitted to earn a return not on the market value of the property used by the public, see Smyth v. Ames, but rather on the original cost of the investment, placing prudent investments in the rate base would seem a more sensible policy than a strict application of “used and useful,” for under this approach it is the investment, and not the property used, which is viewed as having been taken by the public. The investor interest described in Hope, after all, is an interest in return on investment. Hope, 320 U.S. at 603, 64 S.Ct. 281.
Jersey Central (III), 810 F.2d at 1180-81.
¶43. Here, there are compelling arguments on both sides for why CWIP costs should or should not be allowed in the rate base.[23] As mentioned, prior to the Base Load Act, Mississippi traditionally did not allow CWIP, because such costs were not considered used and useful in the rendition of utility service to existing ratepayers. Under this precept, CWIP was considered inequitable because it allowed a double return for the utility. Ostensibly, though, with the advent of AFUDC method accounting and other modern regulatory theories, the double-return concern has likewise been downgraded-as CWIP could still potentially be more beneficial to the ratepayer. But, with AFUDC, the risk of loss from an abandoned project remained with the utility and its investors. Even after a plant went into service and the AFUDC was capitalized and included in the rate base, the risk of loss still remained with the utility company and its investors if the plant were aborted for whatever reason. This is because of the used and useful principle.
¶ 44. The difficulties that confronted the D.C. Circuit in the Jersey Central trilogy illustrate that, despite the demise of Smyth ⅛ fair-value rule, “the ‘used-and-useful’ principle, enunciated [by Smyth], has stood as a bedrock principle of utility rate regulation.” Kentucky Utils. Co. v. F.E.R.C., 760 F.2d 1321, 1324 n. 4 (C.A.D.C.1985). The simplicity of its basics (quid-pro-quo concept) has been recognized and understood by courts going back to the regulation of ferry boats and port facilities by the kings of England. See Hoecher, “Used and Useful”: Autopsy of a Rate Making Policy, 8 Energy Law Journal 303 (1987) (citing Lord Hale, De Jure Maris & Brachiorum Ejusdem, in 1 Harg. Law Tracts 6-8 (1787)). The consumer pays for what he or she gets and gets what he or she pays for.
¶45. The Base Load Act effectively abandons the traditional notion of “used and useful” by characterizing CWIP as a “used and useful component” of furnishing utility service. See Miss.Code Ann. § 77-3-105(l)(a). For our purposes, we are judges-not utility experts. We may only review the methods and results of the Commission’s activity.[24] Our role, though, based on the dictates of the Public Utilities Act, remains: to ensure that the utility rates are lawfully established and that they are fair, just and reasonable, based on the evidence.
*924 ¶ 46. What the Legislature has left in place, however, with the adoption of the Base Load Act, is the Commission’s duty-under Sections 77-3-38 and 77-3-43 to establish a fair, just and reasonable rate base, which requires the Commission to consider and balance the interests of the utility company, its investors, and the ratepayer's. Based on the strictures of Sections 77-3-33 and 77-3-43, exploitive rates are illegal in Mississippi. How the scope of Sections 77 — 3—105(1)(a), (2)(a), and (l)(b) can be squared with the mandates of Sections 77-3-33 and 77-3-43, we do not (and cannot) know at this juncture.
RANDOLPH, P.J., LAMAR, KITCHENS AND KING, JJ., JOIN THIS OPINION.

. Munn explained:
This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what without its operative effect. Looking, then, to the common law, from whence came the right which the Constitution protects, we find that when private property is "affected with a public interest, it ceases to be juris privati only.” This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise De Portibus Maris, 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control.
Thus, as to ferries, Lord Hale says, in his treatise De Jure Maris, 1 Harg. Law Tracts, 6, the king has "a right of franchise or privilege, that no man may set up a common ferry for all passengers, without a prescription time out of mind, or a charter from the king. He may make a ferry for his own use or the use of his family, but not for the common use of all the king's subjects passing that way; because it doth in consequence tend to a common charge, and is become a thing if public interest and use, and every man for his passage pays a toll, which is a common charge, and every ferry ought to be under a public regulation, viz., that it give attendance at due times, keep a boat in due order, and take but reasonable toll; for if he fail in these he is finable.” So if one owns the soil and landing-places on both banks of a stream, he cannot use them for the purposes of a public ferry, except upon such terms and conditions as the body politic may from time to time impose; and this because the common good requires that all public ways shall be under the con *918 trol of the public authorities. This privilege or prerogative of the king, who in this connection only represents and gives another name to the body politic, is not primarily for his profit, but for the protection of the people and the promotion of the general welfare.
Munn, 94 U.S. at 125-126

. An exception is in the case of State ex rel. Pittman v. Mississippi Public Service Commission, 538 So.2d 367 (Miss.1989), in which the Commission adopted a performance formula rate plan proposed by MPC, which contained a provision allowing MPC to include CWIP costs in rate bases without any allowance for funds used during construction (AFUDC), for all projects commenced after July 1, 1987. Without speaking to the CWIP provision itself, this Court reversed the Commission, finding that the Commission had acted outside its statutory authority by adopting the rate plan. See id. at 373 (adoption of the rate plan, itself, was an "utter abrogation by the Commission of its statutory responsibilities and a relinquishment of control to the very entity the Commission is charged by law to regulate”).

. Jersey Central Power & Light Co. v. FERC, 730 F.2d 816 (D.C.Cir.1984) (Jersey Central I) (unanimously affirming the Commission's summary denial of Jersey Central Power & Light's (JCP & L) application to recover $397 million prudently invested in a later-abandoned nuclear plant); Jersey Central Power & Light Co. v. FERC, 768 F.2d 1500 (D.C.Cir.1985) (Jersey Central II) (remanding the case because of the Commission's failure to explain how its summary application of its used- and-useful rule affected the overall end result of the rate, later vacated in favor of en banc review in Jersey Central Power & Light v. FERC, 776 F.2d 364 (1985)); Jersey Central, 810 F.2d 1168 (Jersey Central III) (vacating and remanding the Commission's order for failure to inquire under Hope, whether a rate that excludes recovery of the investment in the abandoned plant is just and reasonable in light of its effect on the investors in the financially distressed utility).

. See, e.g., Neufeld, CWIP: Shifting the Investment Risk to Utilities’ Consumers (1979), available at http://www.nccppr.org/drupal/ content/insightarticle/991/cwip-shifting-the-investment-risk (last accessed June 9, 2015).

. Judicial review has since evolved from the end-result test enunciated by Hope, City of Charlottesville v. FERC, 661 F.2d 945, 949 (D.C.Cir.1981). "Experience has taught that a determination of whether the result reached is just and reasonable requires an examination of the method employed.” Id. at 950 (citing Permian Basin Area Cases, 390 U.S. 747, 791-92, 88 S.Ct. 1344, 1372-1373, 20 L.Ed.2d 312 (1968)).