**JERSEY CENTRAL POWER & LIGHT COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Allegheny Electric Cooperative, Inc., et al., Intervenors.**

**No. 82–2004.**

United States Court of Appeals, District of Columbia Circuit.

August 2, 1985.

Rehearing En Banc Granted Oct. 18, 1985.*

---

* Opinion and Judgment vacated.

James B. Liberman, Leonard W. Belter and Daniel F. Stenger, Washington, D.C., were on petitioner's petition for rehearing.

Before MIKVA, GINSBURG, and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

Concurring Opinion filed by Circuit Judge GINSBURG.

Dissenting Opinion filed by Circuit Judge MIKVA.

BORK, Circuit Judge:

This is an appeal from orders issued by the Federal Energy Regulatory Commission ("FERC") summarily directing Jersey Central Power and Light Company ("Jersey Central") to file reduced rates without benefit of a hearing. In our initial opinion, we upheld the FERC orders, primarily because of our reliance on statements by FERC which we thought suggested that the "end result" test of *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) (Douglas, J.), did not apply to a utility overall but "only to those assets which valid Commission rules permit to be included in the rate base." *Jersey Central Power & Light Co. v. FERC*, 730 F.2d 816, 823 (D.C.Cir.1984). Subsequently, Jersey Central petitioned for rehearing and presented persuasive new arguments suggesting that this conclusion was in error. FERC filed two unhelpful responses to Jersey Central's petition and ultimately joined Jersey Central in requesting that we modify our opinion. Brief for Respondent FERC in Response to the Court's Order of July 16, 1984 at 6 n. 7. After carefully reconsidering the issue and the parties' briefs on rehearing, we are now persuaded that our initial opinion was in error. We therefore vacate that decision and remand the case to FERC for a full evidentiary hearing. Jersey Central should be allowed to present, at that hearing, all of its evidence suggesting that FERC's rate reduction orders violate the end result test by unreasonably denying investors a fair rate of return. If Jersey Central succeeds in proving the allegations it has made before us on appeal, it should promptly be granted a rate increase adequate to satisfy the requirements of *Hope Natural Gas.*[1]

---

1. We have considered the argument advanced by the intervenors that this case is moot, and we

## I.

At the outset, we assume familiarity with the background information and reasoning set forth in our prior opinion. *Jersey Central Power & Light Co. v. FERC*, 730 F.2d 816 (D.C.Cir.1984). We repeat here only those facts and arguments which bear directly on the rehearing petition. From the beginning of this proceeding, Jersey Central has argued that it was entitled to a hearing to present evidence showing that FERC's orders denied it a reasonable rate of return. In its rehearing petition, Jersey Central has reemphasized the inadequacy of the rate of return allowed to its investors.

Jersey Central alleges that "for four years [it] has been unable to pay any dividends on its common stock." Petition for Rehearing and Suggestion for Hearing En Banc at 8. This is alleged to be the case even though under the rates it sought to charge, Jersey Central claims that it "would continue to provide safe, adequate and reliable service at rates *less* than those charged by many of its neighboring utilities." *Id.* (emphasis added). Jersey Central claims that in part as a consequence of FERC's orders it has been "repeatedly on the edge of being forced into bankruptcy." *Id.* at 14. Since 1979 it

> has had no access to the long-term capital markets and has been wholly dependent upon a short-term revolving credit agreement which was subject to termination at a moment's notice. [The company] has been allowed sufficient cash flow to enable [it] to avoid bankruptcy (but not to provide earnings [sufficient] to enable [it] to attract capital or maintain credit).

*Id.* Accordingly, Jersey Central claims that FERC's rate reduction orders are denying investors a reasonable rate of return in order to maintain consumer rates at unusually low levels. These allegations, if true, would suggest that FERC's actions were illegal under the end result test of *Hope Natural Gas.*

## II.

In our initial opinion, we reviewed the reasonableness of FERC's orders pursuant to *Hope Natural Gas* under the mistaken belief that the end result test only applies "to those assets which valid Commission rules permit to be included in the rate base." 730 F.2d at 823. We reached this conclusion in reliance on FERC's "rather terse explanation," *id.*, that "the reasonableness of [the] end result cannot be evaluated without regard to the individual components which comprise a rate." *Jersey Central Power & Light Co.*, 20 F.E.R.C. (CCH) ¶ 61,083, at 61,181 (July 23, 1982) (Order Granting in Part and Denying in Part Application for Rehearing). Now FERC concedes that it did not intend its explanation "to convey that meaning." Brief for Respondent FERC in Response to the Court's Order of July 16, 1984 at 4. Instead, FERC agrees that "the end result stage of the ... proceedings provides the occasion ... to make appropriate adjustments to *any* of the previous determinations that went into the establishment of the rate." *Id.* at 6 (emphasis in original).

After re-examining the issue, we are now persuaded that the end result test applies to both the calculation of the rate of return on invested assets and to the calculation of the proper rate base. As Judge Bazelon explained in *Washington Gas Light Co. v. Baker*, 188 F.2d 11 (D.C. Cir.1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 572, 95 L.Ed. 686 (1951), "the Commission may adopt any method of valuation for rate base purposes *so long as the end result of the rate order 'cannot be said to be unjust and unreasonable.'*" 188 F.2d at 18 (emphasis added), *quoting Hope Natural Gas*, 320 U.S. at 602, 64 S.Ct. at 287. Thus, no matter how the rate base is determined, "the 'total effect,' 'impact' or 'end result' of the rate order" must satisfy the

---

conclude that it is without merit. As both FERC and Jersey Central correctly note, the settlement agreement of May 31, 1983, expressly preserved

Jersey Central's right to appeal the issues here at stake.

requirements of *Hope Natural Gas.* 188 F.2d at 14. Those requirements in turn demand that there be a "reasonable" balancing of consumer and investor interests.

Normally, we would defer to the balancing of consumer and investor interests arrived at by the Commission so long as the result reached falls within a "zone of reasonableness." *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Judge Bazelon has described that zone as being "bounded at one end by the investor interest against confiscation and at the other by the consumer interest against exorbitant rates."[2] *Washington Gas Light Co.,* 188 F.2d at 15 (Bazelon, J.). Judicial protection of the investor interest is important because, as Justice Douglas explained,

> the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. *Chicago & Grand Trunk Ry. Co. v. Wellman,* 143 U.S. 339, 345–346 [12 S.Ct. 400, 402, 36 L.Ed. 176]. By that standard the return of the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. See *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission,* 262 U.S. 276, 291 [43 S.Ct. 544, 547, 67 L.Ed. 981] (Mr. Justice Brandeis concurring).

*Hope Natural Gas,* 320 U.S. at 603, 64 S.Ct. at 288.

■ In this case, we must reconsider the "reasonableness" of FERC's orders in light of its concession that we misconstrued the end result test in our initial opinion. Specifically, we must decide whether FERC's orders fall outside the zone of reasonableness in denying investors a fair rate of return. Based on the totality of the circumstances alleged to exist by Jersey Central, we conclude that FERC's orders reducing rates without a hearing were unreasonable and ignored the requirements of *Hope Natural Gas.* Jersey Central claims that FERC is denying its investors *any* rate of return whatsoever on their investment in order to maintain "rates *less* than those charged by many of its neighboring utilities." These allegations, if true, would suggest that FERC has not achieved a reasonable balancing of investor and consumer interests in keeping with the requirement that rates be "reasonable, just, and non-discriminatory."

We noted in our prior opinion that it is, of course, true that FERC is not chartered to insure utilities against the hazard of not making a profit. Accordingly, under *Hope Natural Gas* "regulation does not insure that the business shall produce net revenues." *Hope Natural Gas,* 320 U.S. at 603, 64 S.Ct. at 288, *quoting FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942). In this case, however, Jersey Central claims that it can earn a rate of return sufficient to preserve the integrity of its capital *without* charging exploitative rates. Assuming that to be true, this is not a case where Jersey Central is asking FERC to guarantee it a profit at the consumers' expense.[3]

---

**2.** The standard of judicial review is not one that is "so vague and devoid of meaning as to render judicial review a perfunctory process. It is a standard of finance resting on stubborn facts." *Colorado Interstate Gas Co. v. FERC,* 324 U.S. 581, 605, 65 S.Ct. 829, 840, 89 L.Ed. 1206 (1945) (Douglas, J.). The question is whether investors are allowed a rate of return sufficient to maintain credit and capital without being exploitative of consumers.

**3.** Obviously, in cases where no rate, exploitative or otherwise, could restore profitability, the *Hope Natural Gas* criteria cannot be used to undo the operation of the marketplace. In this case, however, we face no such dilemma since Jersey Central has made some very successful investments in addition to the Forked River project.

Notwithstanding the foregoing arguments, FERC nonetheless objects that Jersey Central is somehow seizing on the end result test and asking us to use it here as a substantive rule of ratemaking. Brief for Respondent FERC in Response to the Court's Order of July 16, 1984 at 7. Nothing could be further from the truth. Under the end result test as we have described it, FERC is free to employ any ratemaking methodology it pleases.[4] The only requirement is that the methodology used must result in a reasonable balance between consumer and investor interests.

FERC also objects that we cannot reverse its orders because it "rejected inclusion of the cancelled plant as a component of the rate base in reliance on this Court's decision in *NEPCO Municipal Rate Committee v. FERC,* 668 F.2d 1327 (D.C.Cir. 1981), *cert. denied,* 457 U.S. 1117 [102 S.Ct. 2928, 73 L.Ed.2d 1329] (1982)." Brief for Respondent FERC in Response to the Court's Order of July 16, 1984 at 7. We think the Commission misgauges the import of our decision in *NEPCO.* Under *Hope Natural Gas,* we cannot decline to review the reasonableness of FERC's balancing of consumer and investor interests merely because FERC adopted one of several methods of computing a rate base we previously approved. Pursuant to *Hope Natural Gas,* it does not matter that some of the determinations that go into the making of a rate order are correctly made if the end result is unreasonable.[5]

Unlimbering the ultimate malediction of legal debate, the dissent accuses us of regressing to the jurisprudence of *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). Had we committed any such enormity, we would of course deserve the anathema pronounced upon us. But this seems disproportionate since our sin consists in nothing more than taking seriously the admonition of *Hope Natural Gas,* which is quite a different thing from reviving *Lochner.* (The dissent must represent the first recorded instance of anyone confusing the philosophy of Justice Rufus W. Peckham and that of Justice William O. Douglas with respect to economic regulation.) We can make nothing of the dissent's argument unless it means that we should never review rate orders at all, in which case our jurisdiction is drastically limited, indeed non-existent. Apparently, the dissent reads *Hope Natural Gas* to accomplish just that even when investor interests are confiscated or when consumers are made to pay exorbitant rates. Nothing in Justice Douglas' opinion suggests such an extreme hostility to judicial review, and we refuse to join the dissent in equating deference with abdication.[6]

4. For example, we have long held that the Commission is free to use various methods of computing a rate base so long as the end result of the rate order falls within the zone of reasonableness. Thus, we have previously upheld use of both the so-called "used and useful" method, first set out in *Smyth v. Ames,* 169 U.S. 466, 546, 18 S.Ct. 418, 42 L.Ed. 819 (1898), and the far more sensible "prudent investment" method, developed by Justice Brandeis in *Southwestern Bell Telephone Co. v. Public Service Commission,* 262 U.S. 276, 289, 43 S.Ct. 544, 547, 67 L.Ed. 981 (1923) (Brandeis, J., dissenting), and approved by this court in *Washington Gas Light Co. v. Baker,* 188 F.2d 11. The "prudent investment" method has some advantages over the "used and useful" method because it treats utilities more like other businesses by allowing them to start recovering future development costs as they are incurred. Nonetheless, use of either method is certainly permissible so long as a reasonable balancing of consumer and investor interests is achieved as the end result.

5. We also reject FERC's analogy to *NEPCO* because (1) *NEPCO* differed significantly from this case in that it involved a much shorter amortization period with a much less significant loss in interest to the utility; (2) the end result test precludes FERC from adopting a blanket policy on an abandoned plant if that policy would preclude judicial review of the reasonableness of a given ratemaking order under *Hope Natural Gas;* (3) in any event, we seriously doubt whether the blanket policy which FERC claims to have adopted in *NEPCO* is rational, since for no apparent reason it allocates loss to investors as a direct function of the length of an amortization period.

6. The dissent also reprimands us for rehearing this case notwithstanding the fact that we had seriously misapprehended the controlling case law and notwithstanding the fact that *both* parties to this appeal had requested that we modify our original opinion. The dissent seems to believe that rehearing petitions should be sum-

We remand this case to the Commission for a hearing at which Jersey Central can present its evidence on the inadequacy of the rates allowed it.[7]  If Jersey Central succeeds in proving a violation of the requirements of *Hope Natural Gas*, FERC should promptly grant a rate increase adequate to satisfy *Hope*.  Our prior decision reported at 730 F.2d 816 is hereby vacated, and the cause is remanded for further proceedings.

*So Ordered.*

GINSBURG, Circuit Judge, concurring:

Jersey Central's petition for rehearing stimulated supplementary submissions in which even the Commission reported that the panel's initial opinion misperceived the "end result" test of *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).  Judge Bork's opinion on rehearing responds with clarity and candor to the correction and new argument tendered by the parties.

Crying fire where there is no flame, the exorbitant dissenting opinion berates the court for reviving *"Lochner*-style" jurisprudence.  That "grievous fault," I am confident, does not infect the compact, moderate opinion to which I subscribe.  I find in Judge Bork's opinion only open and thoughtful application of "the test of justness and reasonableness" that this court's precedent directs us to apply, evenhandedly, to both "consumer interest" and "investor interest" in the total practical impact of a challenged rate order.  *Washington Gas Light Co. v. Baker*, 188 F.2d 11, 15, 19 (D.C.Cir.1950) (agency gave inadequate consideration to impact of rate increase on consumers), *cert. denied*, 340 U.S. 952, 71 S.Ct. 572, 95 L.Ed. 686 (1951); *see Farmers Union Central Exchange, Inc. v. FERC*,

734 F.2d 1486, 1527 (D.C.Cir.) ("[T]he combination of FERC's rate base and rate of return methodologies [in this case] does not produce an acceptable 'end result' "), *cert. denied*, —— U.S. ——, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984).

The court has returned the case to the Commission for a "fair hearing" so that "proper findings" may be made.  *See FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942).  The dissent says it is "disruptive" to accord Jersey Central an evidentiary hearing before the agency on the particular, uncommon circumstances Jersey Central alleges.  That position makes sense only if one believes that court review under the "end result" approach, whether invoked by "consumer interest" or "investor interest," has become and should remain utterly toothless —"a formal but futile gesture."  *Washington Gas Light Co.*, 188 F.2d at 17.  The jurisprudence that binds us requires respect for the agency's expertise but not, as the dissent seemingly would have it, abdication of our responsibility to review the fairness and rationality of the agency's order.

MIKVA, Circuit Judge, dissenting:

This case demonstrates the importance of leaving well enough alone.  In 1982, Jersey Central Power & Light challenged the Federal Energy Regulatory Commission's refusal to allow the utility to include in its electricity rate base the carrying charges on its investment in a cancelled nuclear power plant.  After a full hearing and careful consideration of the record, we unanimously affirmed the Commission.  *See Jersey Central Power & Light Co. v. FERC*, 730 F.2d 816 (D.C.Cir.1984).

---

marily denied even in such circumstances.  If petitions for rehearing are to serve any useful purpose, however, we think that view must be rejected.

7. It should be noted that the *Hope Natural Gas* end result test secures Jersey Central's constitutional right that its property not be taken without just compensation.  Thus, the utility has

raised a constitutional as well as statutory claim in this case as a result of FERC's ratemaking order.  Before an alleged taking may occur, it seems likely that FERC should have conducted a due process hearing to determine the merits of the utility's case.  Thus, even aside from Jersey Central's statutory right to a hearing, the utility might well have had a valid constitutional due process claim.

Our reasoning was essentially that FERC's decision was made pursuant to a valid, established Commission policy against allowing a utility to collect a return on the unamortized portion of an investment in an abandoned project. *See New England Power Co.*, 8 F.E.R.C.Rep. (CCH) ¶ 61,054 (July 19, 1979), *aff'd sub nom. NEPCO Municipal Rate Committee v. FERC*, 668 F.2d 1327 (D.C.Cir.1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982). We noted that the Supreme Court "long ago upheld the general principle underlying this policy—namely, that utilities are not entitled to have included in their rate base properties not 'used and useful' in providing service to ratepayers." 730 F.2d at 819 (citing, *inter alia, Denver Union Stock Yard Co. v. United States*, 304 U.S. 470, 475, 58 S.Ct. 990, 994, 82 L.Ed. 1469 (1938)).

Jersey Central argued that the Commission's action prevented the utility from paying dividends on its common stock and hampered its ability to attract long-term capital, but we concluded that such consequences did not require FERC to alter or waive its general policy, and hence did not entitle Jersey Central to an administrative hearing. *See United States v. Storer Broadcasting Co.*, 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1956) (agency need not give hearing to party requesting treatment contrary to established agency policy unless the party's allegations would warrant a departure from the general rule); *accord, FPC v. Texaco*, 377 U.S. 33, 39, 84 S.Ct. 1105, 1109, 12 L.Ed.2d 112 (1964).

Nothing has changed since we decided this case last year, except that a majority of the panel has changed its mind. After further reflection, the majority has now concluded that Jersey Central did make out a case for special treatment after all. The argument first rejected and now accepted by the court is that the challenged rate order violates the "end result" doctrine of *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), by denying Jersey City "a fair rate of return." Maj. op. at 1503.

I believe that in reversing ourselves we have taken a giant step backward. Our initial resolution of this case may have been imprecise in minor respects, but it was basically sound. In contrast, today's decision profoundly misconstrues *Hope Natural Gas* and revives a thoroughly discredited theory of judicial review. Accordingly, I dissent.

## I.

To appreciate fully the retrogressive nature of today's decision, it is helpful to place it in historical context. Although the "end result" doctrine upon which the majority relies so heavily received its classic articulation in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), the doctrine actually had its origins two years earlier in *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942), the first Supreme Court decision interpreting the Natural Gas Act. For several decades prior to *Natural Gas Pipeline*, the Court had reviewed rate making decisions with an eye to ensuring that investors received "a fair return upon the value" of their property. *Smyth v. Ames*, 169 U.S. 466, 546–47, 18 S.Ct. 418, 433–34, 42 L.Ed. 819 (1898). The "fair value" test announced in *Smyth* had itself been a sharp departure from the more traditional understanding that courts were not to second-guess prices fixed by the legislature, *see, e.g., Munn v. Illinois*, 94 U.S. 113, 4 Otto 113, 24 L.Ed. 77 (1877); *Peik v. Chicago & N.W. Ry. Co.*, 94 U.S. 164, 4 Otto 164, 24 L.Ed. 97 (1877), and that, in particular, investors in regulated companies had no vested right to financial success, *see Covington & Lexington Turnpike Rd. Co. v. Sandford*, 164 U.S. 578, 17 S.Ct. 198, 41 L.Ed. 560 (1896). Writing for the Court in *Sandford*, Justice Harlan explained that the investor's interest in earning a profit must be balanced by the legislature against the public's interest in paying fair rates: "It cannot be said that a corporation is entitled, as of right, and without reference to the interests of the public, to realize a

given per cent on its capital stock.... The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends." *Id.* at 596, 17 S.Ct. at 205.

The abandonment of these principles of judicial restraint in *Smyth v. Ames* presaged the Court's growing willingness and determination in the early years of the twentieth century to test all exercises of regulatory power against the justices' own understanding of what was "fair, reasonable and appropriate." *Lochner v. New York*, 198 U.S. 45, 56, 25 S.Ct. 539, 543, 49 L.Ed. 937 (1905). Just as the Court reviewed rate making decisions to protect what it saw as the "fair value" of the investors' property, so it scrutinized labor laws, for example, to protect its notion of workplace liberty, *see, e.g., Coppage v. Kansas*, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915) (striking down ban on "yellow dog" contracts) *Adkins v. Childrens' Hospital*, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923) (invalidating minimum wage law); *Lochner* (striking down limitation on hours of work), and examined consumer protection legislation to safeguard its conception of market freedom, *see, e.g., Weaver v. Palmer Bros.*, 270 U.S. 402, 46 S.Ct. 320, 70 L.Ed. 654 (1926) (striking down statutory standards for bedding materials); *Jay Burns Baking Co. v. Bryan*, 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed. 813 (1924) (invalidating legislative standardization of bread loaf weights). *See generally* L. Tribe, *American Constitutional Law* §§ 8–1 to 8–4 (1978) (discussing "the *Lochner* era"). Few now count these decisions among the Court's most sagacious.

As the century progressed, the Court grew to recognize the folly of attempting to establish itself as a "super-legislature," *New State Ice Co. v. Liebmann*, 285 U.S. 262, 300, 52 S.Ct. 371, 383, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting), and, by the time the Natural Gas Act was passed in 1938, the justices had largely ceased to question the practical wisdom underlying congressional exercises of the police power. *See, e.g., United States v. Carolene Products Co.*, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); *NLRB v. Jones & Laughlin Steel Co.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *West Coast Hotel v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). When the Court adjudicated its first rate dispute under the Act, it therefore needed barely a page to reject a facial challenge to the constitutionality of federal regulation of gas rates. *See FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 582–83, 62 S.Ct. 736, 741–42, 86 L.Ed. 1037 (1942). More importantly, the Court in the same decision made clear that its review of rates set by the Federal Power Commission was sharply limited. Chief Justice Stone's remarks for the Court on this score were as follows:

> Section 5(a) [of the Natural Gas Act] directs the Commission to "determine the just and reasonable rate" to be observed, and requires the Commission to "fix the same by order." It also provides that "the Commission may order a decrease where existing rates are unjust ... unlawful, or are not the lowest reasonable rates." On review of the Commission's order by a Circuit Court of Appeals as authorized by § 19(b), the Commission's findings of fact "if supported by substantial evidence, shall be conclusive."

> By long standing usage in the field of rate regulation, the "lowest reasonable rate" is one which is not confiscatory in the constitutional sense. Assuming that there is a zone of reasonableness within which the Commission is free to fix a rate varying in amount and higher than a confiscatory rate, the Commission is also free under § 5(a) to decrease any rate which is not the "lowest reasonable rate." It follows that the Congressional standard prescribed by this statute coincides with that of the Constitution, and that the courts are without authority under the statute to set aside as too low any "reasonable rate" adopted by the Commission which is consistent with constitutional requirements.

> The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas.

Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end.

*Id.* at 585–86, 62 S.Ct. at 742–43 (citations omitted).

Quite clearly, the Court emphasized the "result" of the rate making proceeding in order to underscore the limited scope of judicial review: if the end product is demonstrably within the "zone of reasonableness," there is no occasion for a reviewing court even to consider the Commission's methodology. Chief Justice Stone's opinion gave no hint that the end result of a rate making determination must satisfy some test of reasonableness beyond the constitutional prohibition against uncompensated confiscation and the general statutory requirement of reasoned decision-making. Indeed, the Court expressly noted that "regulation does not insure that the business shall produce net revenues." *Id.* at 590, 62 S.Ct. at 745.

Nonetheless, three members of the Court were concerned that the majority opinion might be read to sanction, once again, intrusive judicial review of the reasonableness of rates. Concurring separately, Justices Black, Douglas, and Murphy worried that the language quoted above might give "renewed vitality to ... [t]he doctrine which makes of 'due process' an unlimited grant to courts to approve or reject policies selected by legislatures in accordance with the judges' notion of reasonableness." *Id.* at 601, 62 S.Ct. at 750. In particular, the concurring justices feared that the Court's focus on the result of rate making might be understood to revive the *Smyth v. Ames* litmus test for appropriate rates:

While the opinion of the Court erases much which has been written in rate cases during the last half century, we think this an appropriate occasion to lay the ghost of *Smyth v. Ames*, 169 U.S. 466 [18 S.Ct. 418, 42 L.Ed. 819], which has haunted utility regulation since 1898. That is especially desirable lest the reference by the majority to "constitutional requirements" and to "the limits of due process" be deemed to perpetuate the fallacious "fair value" theory of rate making in the limited judicial review provided by the [Natural Gas] Act.

*Id.* at 602, 62 S.Ct. at 750 (Black, Douglas & Murphy, JJ., concurring).

By all appearances, the decision in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591 [64 S.Ct. 281, 88 L.Ed. 333] (1944), laid those worries to rest. In a majority opinion authored by Justice Douglas, and in which Justices Black and Murphy concurred, the Court reiterated that "regulation does not insure that the business shall produce net revenues," *id.* at 603 [64 S.Ct. at 288], and it explicitly rejected the notion that rates must be set so as to allow investors a rate of return deemed "fair" by the judiciary. Determining a fair rate of return, the majority observed, is part and parcel of the legislative and administrative task of rate making:

The fixing of prices, like other applications of the police power, may reduce the value of the property being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. It does, however, indicate that "fair value" is the end product of the process of rate-making and not the starting point.... The heart of the matter is that rates cannot be made to depend upon "fair value" when the value of the going enterprise depends on earning under whatever rates may be anticipated.

*Id.* at 601, 62 S.Ct. at 750 (citations omitted).

More significantly, the Court in *Hope Natural Gas* restated the "end result"

analysis of *Natural Gas Pipeline* in terms making even plainer that the test as intended not as a limit on rate making, but rather as a restraint on judicial review:

> We held in *Federal Power Commission v. Natural Gas Pipeline Co.* ... that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of "pragmatic adjustments." And when the Commission's order is challenged in the courts, the question is whether that order "viewed in its entirety" meets the requirements of the Act. Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling. It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

*Id.* at 602, 62 S.Ct. at 750 (citations omitted).

The majority in *Hope Natural Gas* recognized that "the investor has a legitimate concern with the financial integrity of the company whose rates are being regulated." *Id.* at 603, 62 S.Ct. at 751. The Court stopped far short, however, of elevating the investor's "concern" to a judicially protectable right. Indeed, the majority implicitly acknowledged that under certain conditions the Commission might permissibly set rates higher or lower than what was necessary to provide investors with a competitive rate of return, but declined to speculate on what those conditions were because the rates before the Court fully protected the investors' interests. *Id.*

Like Chief Justice Stone in *Natural Gas Pipeline*, Justice Douglas stressed in his opinion for the Court in *Hope Natural Gas* that the language and design of the Natural Gas Act were inconsistent with intrusive judicial review of ratemaking fairness: "Congress has provided in § 19(b) that on review of [§ 5] rate orders the findings of 'finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.'" 320 U.S. at 600–01, 64 S.Ct. at 286–87; *see also* Natural Gas Act § 19(b), 15 U.S.C. § 717r.

The "end result" test of *Natural Gas Pipeline* and *Hope Natural Gas* thus was never intended as a substantive rule of rate making; the test is rather a threshold limitation on judicial review of legislative and administrative rate determinations. As Justice Jackson explained for a unanimous Court in *Market Street Ry. Co. v. R.R. Comm'n*, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945):

> It was noted in the *Hope Natural Gas* case that regulation does not assure that the regulated business make a profit. 320 U.S. at 603 [64 S.Ct. at 288], see *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U.S. 575, 590 [62 S.Ct. 736, 745, 86 L.Ed. 1037]. All that was held was that a company could not complain if the return which was allowed made it possible for the company to operate successfully

*Id.* at 566, 65 S.Ct. at 779.

Accordingly, the Supreme Court has *never* applied the *Hope Natural Gas* doctrine to strike down any administrative or legislative action, although the Court has repeatedly invoked the doctrine in affirming gas rates set by the Federal Power Commission and, later, by FERC. *See FERC v. Pennzoil Producing Co.*, 439 U.S. 508, 518–19, 99 S.Ct. 765, 771–72, 58 L.Ed.2d 773 (1979); *FPC v. Texaco, Inc.*, 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *FPC v. United Gas Pipe Line Co.*, 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967); *Wisconsin v. FPC*, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); *Pennsylvania Water & Power Co. v. FPC*, 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042 (1952); *Panhandle Eastern Pipe Line Co. v. FPC*, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241 (1945); *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945);

*Market Street Ry. Co. v. R.R. Comm'n,* 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945).

In the *Permian Basin Area Rate Cases,* the Court restated the doctrine of *Hope Natural Gas* as follows:

Price control is "unconstitutional ... if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt...." Nonetheless, the just and reasonable standard of the Natural Gas Act "coincides" with the applicable constitutional standards, and any rate selected by the Commission from the broad zone of reasonableness cannot be attacked as confiscatory.

Accordingly, there can be no constitutional objection if the Commission, in its calculation of rates, takes fully into account the various interests which Congress has required it to reconcile.

390 U.S. at 769–70, 88 S.Ct. at 1361–62 (citations omitted). *Permian Basin* thus reemphasized that the contours of the "zone of reasonableness" limit not rate making power but rather judicial review.

This, then, is the "end result" test as articulated in *Hope Natural Gas,* and in every other Supreme Court decision applying the test: reasoned rate making determinations cannot be struck down as unjust or unreasonable so long as the end result— the rates themselves—are permissible, and rates are impermissibly low only if they are so arbitrary as to be constitutionally confiscatory. Until today, our decisions have applied this doctrine faithfully. For example, in *Farmers Union Central Exchange, Inc. v. FERC,* 734 F.2d 1486, 1527 (D.C. Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984), we concluded that "the combination of FERC's rate base and rate of return methodologies does not produce an acceptable 'end result,'" only because the rate base and rate of return selected were not rationally related to each other. Similarly, in *Washington Light Co. v. Baker,* 188 F.2d 11, 16–17 (D.C.Cir.1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 572, 95 L.Ed. 686 (1951), we invalidated a rate order of the District of Columbia's Public

Utilities Commission because we found that the Commission had failed to engage in reasoned decisionmaking. In both cases, we reversed the agency not because we disagreed with the balance it had struck between consumer and investor interests, but rather because we could not discern a coherent path of reasoning leading to the agency's decision.

We assuredly did not hold in either case that the rates ordered were so unreasonable that they could not be upheld no matter how they were arrived at. Indeed, in *Washington Light Gas Co.* we expressly recognized the relevance of the PUC's methodology for judicial assessment of the "end result":

We think the Commission should keep in mind its obligation to facilitate judicial review of its orders and should assemble a record and make findings which cover all the relevant issues. Unless the Commission tells us what "formula or formulae" it has chosen and makes clear the evidentiary support for its findings under whatever formula adopted, we are handicapped in applying even the limited judicial review left us by the Hope cases.

188 F.2d at 23.

In one respect, our decision in *Washington Gas Light Co.* may appear to lend support to our decision today, but the appearance is superficial. Although reversing the PUC on other grounds, we affirmed its decision to include an abandoned plant in the Washington Gas Light Company's rate base. *See id.* at 17–20. The analogy to Jersey Central's request is plain. But our approval of the rate base in *Washington Gas Light Co.* was based squarely on deference to administrative discretion; we held that the Commission was free to depart from the traditional "used and useful" standard of rate base valuation so long as it took into account all relevant interests, including "the extent to which the risk that this particular plant would become obsolete was borne by investors in the past and the extent to which they were compensated for it." *Id.* at 20. We certainly did not hold that it would be an

abuse of agency discretion—or an unconstitutional taking—for the PUC to adhere to the "used and useful" standard. Indeed, we noted that the rationale for such a standard was "obvious" in cases where a utility claimed that rates were confiscatory: "the company was entitled to 'just compensation' only for property which was 'taken' for the public service; it could not expect a return (or compensation) for property which could not and would not be 'taken' because it was no longer 'used and useful.'" *Id.* at 18.

## II.

Although hedging the point somewhat, the majority appears to acknowledge that FERC's rate order in this case may be reversed only if the end result—the rates *Jersey Central* was allowed to change— fall outside the "zone of reasonableness." *See* maj. op. at 1502–03. The majority also reads *Hope Natural Gas*, however, to establish a proposition the Supreme Court has never advanced: that "it does not matter that some of the determinations that go into the making of a rate order are correctly made if the end result is unreasonable." *Id.* at 1504.

As I have tried to show in the preceding section, what the Supreme Court has repeatedly reaffirmed is the *converse* of that statement, namely that the Commission's methodology is irrelevant if the resulting rate is demonstrably reasonable. "If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the [Natural Gas] Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." *Hope Natural Gas,* 320 U.S. at 602, 64 S.Ct. at 288. In no way does it follow from that rule that a rate not obviously fair on its face may not be shown to be reasonable by virtue of the manner in which it was determined.

In any event, I do not take the majority to deny that the methodology of rate making may bear on the reasonableness of the result. My impression, in other words, is that the majority accepts the truth, at least

in some circumstances, of the Commission's statement that "the reasonableness of the end result cannot be evaluated without regard to the individual components which comprise a rate." *Jersey Central Power & Light Co.,* 20 F.E.R.C.Rep. (CCH) ¶ 61,083, at 61,181 (July 23, 1982). The majority's position appears to be simply that the rates ordered in this case are so low that they fall outside the "zone of reasonableness" no matter how they were set.

That amounts to an assertion that the rates constitute an unconstitutional taking, because, as the majority also seems to recognize, rates are unreasonably low only if they are confiscatory under the fifth amendment. *See* maj. op. at 1502–03. In a somewhat odd location, the majority states that the end result test "secures" the fifth amendment's ban on uncompensated takings. *See id.* at 1505 n. 7. Constitutional prohibitions, of course, do not require legislative enactments such as the Natural Gas Act in order to be binding, and I do not understand the majority to suggest that *Hope Natural Gas* imposes a substantive floor on permissible rates higher than that set by the Constitution itself. Rather, I assume the majority means only to repeat what the Supreme Court has made clear: that "the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense." *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942); *accord, Washington Light Co. v. Baker,* 188 F.2d 11, 15 (D.C.Cir.1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951).

A finding that a rate order is constitutionally confiscatory is not to be lightly made. The Supreme Court has repeatedly stressed that price fixing does not effect an uncompensated taking merely because investors are denied their expected return. *See, e.g., Permian Basin Area Rate Cases,* 390 U.S. 747, 768–69, 88 S.Ct. 1344, 1360–61, 20 L.Ed.2d 312 (1968). Indeed, even in traditionally competitive industries, "[l]oss of future profits—unaccomplished by any physical property restriction—provides a slender reed upon which to rest a takings

claim." *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979). Nowhere is this principle more firmly established than in the field of utility regulation. As the majority recognizes, "FERC is not chartered to insure utilities against the hazard of not making a profit," maj. op. at 1503, and "regulation does not insure that the business shall produce net revenues," *id.* (quoting *Hope Natural Gas,* 320 U.S. at 603, 64 S.Ct. at 288; *Natural Gas Pipeline,* 315 U.S. at 590, 62 S.Ct. at 745). It follows that the rates allowed to Jersey City are not confiscatory, and hence do not fall outside the "zone of reasonableness," merely because they do not allow the utility to pay dividends to its shareholders.

Despite all these givens, the majority concludes surprisingly that FERC must set Jersey Central's rates high enough so that the utility can earn a profit. According to the majority, what sets Jersey Central's petition apart from a garden variety request by a utility for guaranteed profits is the fact that some neighboring utilities charge rates even higher than those proposed by Jersey Central. *Id.* at 1503. This rationale makes the court's decision even more remarkable, for it means that implicit in today's holding is the quiet announcement of a major new federal entitlement. Although regulated corporations have no judicially protectable right to earn net revenues *in general,* the court apparently holds that they *do* have a right to earn net revenues if they can earn them at rates lower than those charged by one or more corporations in the same line of business located nearby. And since the end result test coincides with the requirements of the takings clause, the entitlement fashioned today presumably has a constitutional as well as a statutory dimension: it amounts to confiscation, the majority says in essence, for government regulators to prevent a utility from earning a profit if it can do so at rates comparable to rates charged by neighboring utilities.

What is most startling is that the court's opinion produces this new substantive right virtually out of thin air; the majority just makes it up. It is apparently of no concern to the majority that the Supreme Court has never suggested such a limit on the Commission's authority; indeed, the majority sees no need to refer to any decision by any court, or even a concurring or dissenting opinion, granting to investors in regulated industries anything like the conditional right to dividends recognized by the court today. *Cf. Dronenburg v. Zech,* 741 F.2d 1388, 1396 (D.C.Cir.1984) (Bork, J.) (lower federal courts should not "freely create new constitutional rights").

The majority seems to assume that a rate comparable to those of neighboring utilities necessarily does not exploit customers. Such an assumption might make some sense were there a competitive market for electricity service; in such a case the market rate could be taken as the best measure of what is reasonable. But, of course, there is nothing approaching a competitive market in electricity. We deal here with natural monopolies. Congress has accordingly charged FERC with setting power rates that are "just and reasonable" in light of investor and consumer interests. What rates are "just and reasonable" will in general depend on the utility's legitimate costs, and those costs can of course vary widely even among neighboring utilities. This dependence and this variation will be present regardless whether rate makers apply the "prudent investment" method favored by the majority, *see id.* at 1504 n. 4, or the more traditional "used and useful" method, *see Jersey Central Power & Light Co. v. FERC,* 730 F.2d 816, 819 (D.C.Cir. 1984). That some utilities with monopoly markets adjacent to Jersey Central's are allowed to charge more than Jersey Central thus presumably signifies nothing more than that Jersey Central has access to cheaper sources of power, or for some other reasons has fewer legitimate costs.

The majority's position seems to be that Jersey Central's customers can have no valid complaint so long as customers of some neighboring utilities are paying higher rates. But why not? Why should the fortuity that adjacent utilities have high legitimate costs force Jersey Central's cus-

tomers to underwrite the carrying cost of Jersey Central's wholly unproductive investment? It is hard to fathom the majority's denial that Jersey Central is "asking FERC to guarantee it a profit at the consumers' expense." *Id.* at 1503. Who, exactly, does the majority expect to pay the extra charges on Jersey Central's bills to its customers? Invisible hands there may be, but they do not write checks.

In the end, the sole basis for the new entitlement fashioned in today's decision is that it strikes the majority as just. It seems to the majority that FERC, by ordering rates below that charged by neighboring utilities and too low to pay dividends on common stock, has "den[ied] investors a fair rate of return." *Id.* at 1503. The majority's sense of economic fairness may or may not be finely honed; where the court errs fundamentally is in substituting its own sense for that of the Commission. Disregarding decades of instruction that "it is not the function of a court itself to engage in rate making," *FPC v. Colorado Gas Co.*, 348 U.S. 492, 501, 75 S.Ct. 467, 473, 99 L.Ed. 583 (1955), the majority reads the end result doctrine of *Hope Natural Gas* and *Natural Gas Pipeline* as a license to test rate orders against its own notion of what constitutes "a fair rate of return."

The majority's sense of economic fairness differs in some details from that expressed in *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898). The *Smyth* Court thought it indisputable, for example, that regulated corporations were entitled to no return on unproductive property like Jersey City's cancelled nuclear plant. Nonetheless, the theory underlying today's decision is precisely the theory of *Smyth:* "the company is entitled to ask ... a fair return upon the value of that which it employs for the public convenience," *id.* at 547, 18 S.Ct. at 434. Forty years after the decision in *Natural Gas Pipeline*, the fears of Justices Black, Douglas and Murphy have thus proven well-founded: the end result test fashioned in that case has been "deemed to perpetuate the fallacious 'fair value' theory of rate making in the limited judicial review provided by the [Natural Gas] Act." 315 U.S. at 602, 62 S.Ct. at 750 (Black, Douglas & Murphy, JJ., concurring). Despite all the majority's talk about *Hope Natural Gas,* today's decision in reality signifies a renaissance of *Lochner*-style substantive due process in ratemaking law; the court today embraces the very decisions *Hope Natural Gas* attempted to repudiate four decades ago.

## III.

The implicit basis of our initial decision in this case was straightforward and sensible: a rate order will not be reversed as unreasonable if it allows a reasonable rate of return on a reasonably defined rate base. Not only is such a result required by the general principles, discussed above, of judicial deference to administrative expertise, but a contrary holding, we noted, "would revolutionize ratemaking" by rendering "superfluous" the very notion of a rate base. Moreover,

> [b]ecause the rates set by FERC are primarily challenged by utilities on the grounds that they are "unjust and unreasonable" and therefore do not generate a fair rate of return, forcing the Commission to hold a hearing each time a utility claimed that applying a particular policy would produce an unjust and unreasonable end result would effectively end the "judicially-recognized exception to [a utility's] statutory right to a Commission hearing ... where the facts are not in dispute and the new tariff contravenes valid and explicit FPC [now FERC] regulations or policy."

*Jersey City Power & Light Co. v. FERC,* 730 F.2d 816, 823 (D.C.Cir.1984) (citations omitted).

Our decision may not have identified the grounds for our holding with the degree of precision one would ideally desire. In particular, we may have created unnecessary confusion by stating that the end result test was to be applied in this case "only to those assets which valid Commission rules permit to be included in the rate base." *Id.* at 823. That approach was sound for the

case before us, since there was no serious contention that either the rate base or the rate of return were arbitrary when considered separately. Our language could perhaps have been misconstrued, though, to preclude the Commission in other cases from using a generous rate of return to compensate for excessively parsimonious rate base determinations, or a low rate of return to balance out an overly inclusive rate base.

Notwithstanding this ambiguity, I see no need for a new opinion in this case. Indeed, even if I harbored some doubt in retrospect that we were correct to affirm the Commission—which, for the reasons explained above, I do not—I would be extremely reluctant to decide this case over again. Despite the tone of Olympian certitude typically adopted in judicial opinions, judging is a human enterprise, and on average judges are probably no less apt than anyone else to question their actions in hindsight. Law differs from some other human endeavors, however, in its inhospitability to constant revision. Legal principles of course evolve over time, but, for a host of familiar reasons, it is important that legal disputes, once settled by the courts, generally stay settled. In the ordinary run of things, judges promote neither justice nor the general welfare by rehearsing old arguments whenever they feel a tinge of uncertainty. Absent exceptional circumstances—and this case, it seems to me, presents none—the time and resources of the courts are better devoted to getting things right the first time.

The majority's new opinion in this case demonstrates yet another reason for courts to avoid redeciding old controversies: we are as likely to mess things up as we are to straighten things out. We would have had ample opportunity to refine our interpretation of *Hope Natural Gas* when the next case implicating the end result doctrine arose. If our imprecision threatened to create excessive uncertainty in the interim, there might have been cause to amend our

initial opinion. Regardless whether such modification was warranted, however, it would have been far better to leave our initial opinion largely in place, altered or unaltered, than to replace it with the ill-considered and profoundly disruptive decision issued by the court today.

Whatever its minor faults, Judge Bork's original opinion for the panel correctly identified the crux of this controversy:

> This is not a case in which the utility alleges that unjust and unreasonable rates are driving it into bankruptcy. Nor is it a case in which the utility claims that its ability to provide service to its customers is threatened. Jersey Central's expressed concern is for the well-being of its common equity investors who are paying the carrying charges on the debt and preferred stock. That one may sympathize with their plight does not mean that the Commission acted beyond its authority.

*Jersey City*, 730 F.2d at 824. This analysis was fully consistent with and faithful to the spirit of *Natural Gas Pipeline, Hope Natural Gas*, and the many cases recognizing the Commission's discretion to grant electric utilities a return only on property that is "used and useful." Today's decision purports to follow these decisions but ignores their central meaning: courts are not to impose their own sense of economic justice on the rate making decisions Congress has entrusted to the Commission. By disregarding that principle, the majority revives the spectre of a line of cases the Supreme Court wisely laid to rest half a century ago.

For all these reasons, I dissent.